UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DEBORAH A. LAUCELLA,               :
                                   :CIVIL ACTION NO. 3:17-CV-2019
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
NANCY A. BERRYHILL,                :
Acting Commissioner of             :
Social Security,                   :
                                   :
          Defendant.               :
                                   :
_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). (Doc. 1.) Plaintiff protectively filed an application on April 2, 2014, alleging disability beginning on September 30, 2012. (R. 12.) After Plaintiff appealed the initial May 16, 2014, denial of the claim, a hearing was held by Administrative Law Judge ("ALJ") Susan L. Torres on March 8, 2016. (*Id.*) ALJ Torres issued her Decision on April 15, 2016, concluding that Plaintiff had not been under a disability, as defined in the Social Security Act ("Act"), from September 30, 2012, through the date of the Decision. (R. 25.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on September 14, 2017. (R. 1-6.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on November 3, 2017. (Doc. 1.)

She asserts in her supporting brief that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ erred in failing to adequately consider the number of work absences that would result from emergency room visits and hospital admissions during the relevant time period; 2) the ALJ erred in according limited weight to Plaintiff's treating physicians' opinions; and 3) the ALJ erred in failing to include bilateral radiculopathy as a severe impairment at step two of the sequential evaluation process. (Doc. 13 at 19.) For the reasons discussed below, the Court concludes Plaintiff's appeal is properly granted in part.

## I. Background

Plaintiff was born on January 15, 1969, and was forty-three years old on the alleged disability onset date. (R. 24.) She has a high school education and past relevant work as a hair stylist, deli worker, and claims clerk. (*Id.*) In an April 3, 2014, Disability Report, Plaintiff alleged that her ability to work was limited by diabetes, a heart condition, a back condition, PTSD, and gastroparesis. (R. 147.)

### A. *Medical Evidence*

### 1. Primary Care

Jason Galicia, M.D., of Keytsone Health was Plaintiff's primary care provider during the relevant time period. (R. 490-532, 598-602, 841-58, 858-61, 872-87.) In February 2012 Dr.

Galicia noted the following chronic problems and the status of each: 1) diabetes mellitus was poorly controlled with Plaintiff taking medications regularly but not checking blood sugars at home; 2) hyperlipidemia was controlled with medication; 3) GERD was stable and controlled with medication; 4) coronary atherosclerosis was fairly controlled with Plaintiff taking medication regularly and she had not yet seen a cardiologist; 5) chronic low back pain status was stable with Plaintiff taking medications regularly and Plaintiff complained of worsening symptoms; and 6) PTSD was stable and Plaintiff did not require medications. (R. 498.) Physical exam of the spine was positive for posterior tenderness, paravertebral muscle spasm, and bilateral lumbosacral tenderness. (R. 499.)

In July 2013, Plaintiff presented to Dr. Galicia for medical assistance form completion. (R. 504.) He noted that she had not been seen for eighteen months because of insurance constraints. (*Id.*) Dr. Galicia reported that diabetes was poorly controlled and other chronic conditions were either fairly controlled or stable. (*Id.*) He recorded no problems on physical exam. (R. 505-06.)

October 2013 office visit notes indicate Plaintiff was having worsening exacerbation of her lumbosacral pain and worsening radiation of the left lower extremity with weakness and numbness. (R. 513.) Physical exam of the extremities showed positive 3/5 muscle strength on the left lower extremity, 75% sensory deficit as

3

a pressure, pain on light touch on the left lower extremity, and absent reflexes on both lower extremities. (R. 514.)

On March 14, 2014, Plaintiff saw Dr. Galicia for follow up after she had been in the hospital overnight due to nausea and vomiting. (R. 529.) Office notes indicate Plaintiff had been diagnosed with gastroparesis secondary to uncontrolled diabetes and opioid use. (R. 529.)

In June 2014, Plaintiff complained of gait imbalance and unsteadiness and worsening back issues especially with prolonged standing. (R. 883.) Dr. Galicia added that pain management had increased her medications and she was doing well on Valium, morphine, and oxycodone. (*Id.*) Dr. Galicia noted that Plaintiff was being followed by endocrinology for her diabetes. (R. 882.) Regarding Plaintiff's thoracic or lumbar radiculitis, he recorded that her "unsteadiness could be proprioception loss, likely from the back issue, continue pain management evaluation and will trial physical therapy next visit if persistent." (*Id.*)

In July 2014, Dr. Galicia reported that Plaintiff was "having difficulty sustaining any form of work because of her radicular symptoms and with disc bulging," and she was having difficulty with uncontrolled blood sugars which were "very labile." (R. 877.) He noted that her pain specialist recommended that she was not suitable for any kind of work and she also needed disability because of her uncontrolled blood sugars. (*Id.*)

4

In December 2014, Dr. Galicia noted Plaintiff's lumbago was doing well on her narcotic regimen, her gastroparesis was stable on Reglan, she would be given a new prescription for Valium for her PTSD, and she was stable from a cardiac standpoint.  (R. 857.)

Plaintiff saw Dr. Galicia in April 2015 for a routine visit. (R. 598.)  He noted that her diabetes was being managed by endocrinology and she was also seeing pain management.  (R. 599.) Dr. Galicia's Assessment/Plan included the following: her diabetes was improving but she would need further adjustments about which he would defer to endocrinology; cardiac problems were stable on medication regimen; gastroparesis was stable with Plaintiff taking Reglan as needed; GERD was controlled with Protonix; Plaintiff was followed monthly by pain management for lumbosacral radiculopathy and was reportedly doing well on a narcotic regimen; and PTSD was stable on her psychiatric regimen and she would discuss medication side effects with psychiatry.  (R. 598.)  No problems were recorded on physical exam.  (R. 599.)

In November 2015, Dr. Galicia noted that Plaintiff recovered well from a recent episode of gastroparesis exacerbation and she would continue Reglan as needed.  (R. 846.)

In January 2016, Plaintiff reported chronic left shoulder pain for which Dr. Galicia recommended further diagnostic evaluation and ordered an upper extremity MRI.  (R. 841.)

**2.**    **Endocrinology Specialist**

On April 9, 2014, Plaintiff presented to Tiffany Morton, M.D.,

of Summit Endocrinology for evaluation of poorly controlled diabetes. (R. 231.) Dr. Morton noted that Plaintiff had not been checking her blood sugars and needed a new meter, she was following with GI for gastroparesis and Reglan had improved her symptoms, she had a history of peripheral neuropathy with numbness and tingling worse at night, she was followed in the pain clinic for chronic back pain, she was not working, and she was filing for disability. (R. 231.) No problems were found on physical exam and Dr. Morton specifically noted that Plaintiff walked with a normal gait and 5/5 muscle strength bilaterally in the upper and lower extremities. (R. 232-33.) She also noted that Plaintiff subjectively complained of neuropathy symptoms but foot check showed full sensation. (R. 233.) Dr. Morton's plan was for Plaintiff to continue on her current medication regimen and check her blood sugars four times daily for two to three weeks and bring the meter to her next visit. (R. 233.)

On September 23, 2014, Dr. Morton noted that Plaintiff's last visit was five months earlier and she had missed several appointments in the interim. (R. 1073.) Plaintiff reported that she was fatigued, and had neuralgias and numbness but no leg swelling or weakness. (*Id.*) No problems were noted on physical exam. (R. 1074-75.) Dr. Morton assessed Plaintiff's diabetes to be poorly controlled in setting of noncompliance and poor follow-up. (*Id.*) She noted, however, that Plaintiff had started taking

insulin as directed and her blood sugars were improving. (*Id.*) Dr. Morton also noted that Plaintiff's foot check was normal although she subjectively complained of neuropathy symptoms. (R. 1075.)

In November 2014, Plaintiff again reported fatigue and arthralgias but denied leg swelling, numbness, and weakness. (R. 1078.) She also reported decreased energy and hair loss. (*Id.*) No problems were recorded on physical exam. (R. 1079-80.) Dr. Morton continued to find diabetes poorly controlled with a history of poor compliance and lack of blood sugar data and, although she was attempting to improve, blood sugar levels were worse than at the previous visit. (R. 1080.) She again noted that Plaintiff's foot check showed full sensation but subjective neuropathy symptoms were reported and she was taking neurontin. (*Id.*) Office notes indicate Plaintiff was being seen at the pain clinic for neuropathy and chronic back pain with a taper of narcotic medications planned. (R. 1078.) In March 2015, Dr. Morton again reported poorly controlled diabetes, adding that Plaintiff had not been checking her blood sugars. (R. 594.)

3. **Pain Management**

a. *Rehab Medicine Associates*

Plaintiff was seen at Rehab Medicine Associates, P.C., almost monthly from March 2014 through September 2016. (R. 465-88, 580-83.) She was primarily seen by Jay J. Cho, M.D., who initially

7

evaluated her on March 19, 2012, at the request of Dr. Galicia.
(R. 488.)  Plaintiff complained of pain in the low back which
sometimes extended to the left thigh and hamstring.  (*Id.*)  At the
time she was working as a packer in a factory where she was
standing and bending all day as well as lifting.  (*Id.*)  Physical
exam showed almost full mobility of the lumbar spine, tenderness at
the piriformis, and mildly limited trunk rotation.  (R. 487.)  Dr.
Cho found no sign of radiculopathy.  (*Id.*)  He thought the pain was
purely muscle, myofascial type pain with underlying facet
degenerative joint disease at L5-S1.  (*Id.*)  He noted that she was
starting to see early signs of sensory diabetic neuropathy in the
legs.  (*Id.*)  Ne recommended Percocet as needed for pain and
McKenzie's exercises as the best way to decrease back pain and
increase muscle strength.  (*Id.*)

In April Dr. Cho noted that Plaintiff was able to resume all
activities though she said Oxycodone (given for surgery) was not
strong enough.  (R. 485-86.)  Plaintiff was working as a packer for
a food company and attending school for criminal justice at the
time.  (R. 486.)  Exam showed lumbar spine mobility was full,
single leg raise was negative bilaterally, DTR was present but
somewhat depressed, and pinprick exam was impaired in the foot
area.  (R. 484-85.)  Dr. Cho recommended that Plaintiff stop
Percocet and start Oxycodone and Amitriptyline.  (R. 485.)

In May Dr. Cho stopped Amitriptyline and tried Klonopin which

was reported to be "working excellent" in June with Plaintiff continuing all activities. (R. 483, 484.) Although he found some tenderness at the upper mid-thoracic area due to scapula muscle weakness with neuropathy, absent DTR in the legs, and significant sensory loss in the legs with trophic change in July, Dr. Cho noted that pain was controlled well and Plaintiff had resumed all activities, "including vocation." (R. 482.)

On September 13, 2012, Plaintiff reported increased pain and back spasms related to taking care of her father. (R. 481.) Office notes indicate she was working as a packer at the time. (*Id.*) This report continued in October when Dr. Cho observed that Plaintiff was doing well overall. (R. 480.) In November, Plaintiff reported she was temporarily working a second job and her pain was much better controlled. (R. 479.) Dr. Cho found some trapezius tenderness, absent DTR in the legs and impaired pinprick, and the ability to heel/toe walk. (*Id.*) He continued to assess lumbar spine pain with facet DJD, myofascial pain, and diabetic neuropathy. (R. 479.) He commented that the current medications were controlling symptoms reasonably well. (*Id.*)

In January 2013 Dr. Cho found increased muscle spasms and diabetic neuropathy were causing more pain. (R. 477.) He related the back pain to an upper respiratory infection. (*Id.*) Plaintiff was much better by the end of January and continued to work as a packer on second shift. (R. 476.) She reported at the time she

was going for water exercise and therapy and going to the gym regularly which helped with her leg and back pain. (*Id.*) In March and early April, lower back pain was reportedly well controlled. (R. 474, 475.) Although Dr. Cho noted the development of right shoulder tendinopathy in March which Plaintiff said caused lifting problems, he noted that pain was well controlled in April and Plaintiff had been able to resume all activities. (*Id.*) On April 29, 2013, Dr. Cho noted that Plaintiff was "doing excellent." (R. 473.) The Review of Systems indicated that Plaintiff had more energy, had been able to increase her activities, she was going to the gym, her blood sugar was more stable, and she could perform her jobs. (*Id.*) On May 20, 2013, Dr. Cho noted that Plaintiff was able to perform her job and all activities but she had pain in the right shoulder due to overuse for which he gave her Voltaren gel. (R. 472.) On June 24, 2013, he noted that Plaintiff reported the gel was working "fantastic" for her and she was "very happy." (R. 471.)

On July 22, 2013, Plaintiff stated that her lower back pain was not too bad but she had more tingling/numbness and aching pain in both feet and she felt some weakness after walking for a while. (R. 470.) She also reported that she had been in the hospital emergency room because of severe constipation and the ER doctor gave her magnesium citrate. (*Id.*) Dr. Cho commented that "[m]ore diabetic peripheral neuropathy is now a problem." (*Id.*) He

recommended cutting back on Oxycodone and Valium, and he gave her laxatives. (*Id.*) No major problems were noted in August and September (R. 468, 469) but Plaintiff reported a lot of pain in her back related to two jobs with continuous bending and lifting (R. 467). Physical exam showed markedly limited lumbar spine mobility with reversed lordosis, palpable muscle spasms mid to lower lumbar area, S-I joint tenderness, trochanter bursa tenderness, ongoing absent DTR, and diffuse neuropathic change in the legs with impaired pinprick. (*Id.*) Dr. Cho noted that he reviewed the November 14, 2013, MRI films which showed mild facet DJD, mainly L4-5, with mild foraminal stenosis and mild central spinal canal stenosis, and small size left L5-S1 herniated disc but clinically nonsignificant. (*Id.*)

In early 2014, Dr. Cho noted that Plaintiff's main problem was systemic pain with advanced diabetic polynueropathy and her lower back pain was "not a big issue." (R. 466.) He recommended that she stay on all medications and control her diabetes, take vitamins, and do her exercises. (*Id.*) Plaintiff continued to work through March 2014 (R. 465, 466) but in May she reported that she stopped working at the end of March having been "on and off of work since 2012 due to diabetes, polyneuropathy and other things." (R. 583.) Dr. Cho noted that Plaintiff had applied for disability and he agreed that Plaintiff was not able to work with the diabetic polyneuropathy, proximal muscle weakness, and back pain with

11

aching.  (R. 583.)  On physical exam he found lumbar spine aching pain and mildly limited range of motion; sitting single leg raise at 90 degrees bilaterally; decreased muscle tone; tenderness in the trochanter bursa, S-I joint, gluteus, and lumbar spine; and absent DTR.  (*Id.*)

In June, Plaintiff reported trouble doing activities of daily living, she had aching in her entire body, and she had no energy.  (R. 582.)  On physical exam, Dr. Cho's findings included decreased muscle tone with atrophy in the proximal muscles, trunk muscles, and shoulder muscles; tenderness in the lower back, S-I joint, and gluteus; absent DTR; and sensory impairment.  (*Id.*)  He stated the following in the "Comment" section of the record: "[a]dvanced diabetic polyneuropathy is a big problem[;] [p]roximal muscle weakness[;] [t]his patient is not able to work any job."  (*Id.*)  In September 2014, Jeffrey Sarsfield, M.D., noted that Plaintiff was on permanent disability due to diabetic neuropathy.  (R. 581.)

b.  *Summit - Pain Medicine*

Plaintiff had an initial visit with Amanpreet Sandhu, M.D., of Summit - Pain Medicine on November 3, 2014.  (R. 586-89.)  She presented with chronic pain involving her lower back which she attributed to bulging discs as well as a burning sensation involving both feet which she attributed to diabetic neuropathy.  (R. 586.)  She said the pain, which she rated at 8/10-10/10, interfered with sleep, her ability to do activities of daily

12

living, and social functioning. (R. 586.) Plaintiff also said she was unable to work due to chronic pain, she could not sit or stand for long periods, and she could not lift or do any bending activity. (*Id.*) Dr. Sandhu noted that Plaintiff had recently gone on Medicaid and was told she would not be seen by Dr. Cho or Dr. Sarsfield anymore. (*Id.*) Physical exam showed musculoskeletal normal range of motion, motor 5/5 bilateral upper and lower extremities, sensory soft touch intact bilaterally except decreased sensation in the feet bilaterally, normal gait, SLR negative, Faber positive bilaterally, SI tenderness bilaterally, positive midline and paraspinal muscle tenderness of the lumbosacral spine, lumbar flexion and extension caused pain, and facet loading strongly positive bilaterally. (R. 587-88.) Dr. Sandhu assessed the following: intervertebral disc displacement lumbar without myelopathy; lumbago; myalgia and myositis unspecified; neuritis or radiculitis thoracic or lumbosacral unspecified; other chronic pain; sacroiliitis not eslewhere classified; spondylosis lumbar without myelopathy; and diabetes with neurological manifestations type II uncontrolled. (R. 588.) Dr. Sandhu explained that Plaintiff had multiple pain generators and "unfortunately" she was on high-dose narcotics and had developed significant tolerance and dependency. (R. 589.) Because of this, Dr. Sandhu recommended Plaintiff taper down the narcotics substantially and discontinue Valium, and noted that following the taper Plaintiff would be

considered for interventional spine procedures. (*Id.*) For the neuropathic component of her pain and diabetic neuropathy, Dr. Sandhu recommended that Plaintiff continue Neurontin. (*Id.*) Plaintiff was to follow up with Dr. Sandhu as needed but she did not return to the practice. (*Id.*)

c.   *American Spine*

Plaintiff was seen for back pain almost monthly from December 2014 through February 2016 at American Spine in Hagerstown, Maryland, by Mike Yuan, M.D., Shirley Coffie, ANP, or Susan Bennett, PA. (R. 889-969.) On December 4, 2014, Plaintiff said she had pain in her lower back which radiated to both feet, ankles, calves, thighs, and arms. (R. 965.) She described the pain as aching, burning, deep, diffuse, dull, sharp, shooting, stabbing, and throbbing; she said it was aggravated by daily activities and relieved by pain medications and rest. (*Id.*) Examination of back and spine showed posterior tenderness, lumbosacral paravertebral muscle spasm, and antalgic gait. (R. 968.) Dr. Yuan assessed displacement of intervertebral disc with MRI ordered; degeneration of lumbar or lumbosacral intervertebral disc; thoracic or lumbar radiculitis; and chronic pain syndrome. He noted that Plaintifff had previously been managed by Dr. Cho and his office was closed. (*Id.*) Dr. Yuan planned to change Plaintiff's pain medication regimen. (R. 969.)

In January and February 2015, Dr. Yuan noted that Plaintiff's

pain was stable and her medication regimen would be continued as it was effective and without side effects.  (R. 955, 960.)

Plaintiff reported constant severe symptoms in March 2015. (R. 948.)  Dr. Yuan did not change her medications and noted she was functioning without evidence of addiction or diversion.  (R. 951.)  In April, Plaintiff reported moderate to severe pain.  (R. 943.)  On physical exam, Dr. Yuan reported that Plaintiff was in pain, with posterior tenderness, lumbosacral paravertebral muscle spasm, positive single leg raise, passive dorsiflexion of the right foot painful, and antalgic gait.  (R. 945.)  Plaintiff reported that increased pain was related to taking care of her elderly mother.  (R. 946.)  In May and June, Dr. Yuan noted that Plaintiff's pain was stable.  (R. 938, 942.)

On July 2, 2015, Dr. Yuan recorded that Plaintiff complained of left shoulder pain for which he intended to get an imaging study and he increased some pain medications.  (R. 933.)  He noted that she was able to function with her current medications without side effects.  (*Id.*)

On July 30th Plaintiff presented to Ms. Coffie with lumbar spine pain which she said fluctuated and she rated as 10/10 at its worst and 8/10 at the time of the visit.  (R. 925.)  She said the pain radiated to the lower back and left leg and symptoms were aggravated by climbing and descending stairs, daily activities, bending, sitting, standing, and walking.  (*Id.*)  Plaintiff also

complained of shoulder pain, left greater than right, which had been chronic and intermittent. (*Id.*) Physical exam findings included normal gait, tenderness of the lumbar spine, moderate pain with range of motion, and left buttock pain. (R. 929.) Ms. Coffie noted that Plaintiff's medications allowed her to perform activities of daily living and no side effects were reported. (*Id.*) Plaintiff was again noted to be stable and able to perform activities of daily living in August and October with no new findings reported. (R. 918, 923.) Ms. Coffie recorded that the lumbar MRI done in November 2014 showed L5-S1 annular tear with small central disk herniation and a September 2014 EMG showed bilateral S1 radiculopathy. (R. 918.)

In November 2015, Ms. Bennett's muscoloskeletal exam showed only an antalgic gait and office notes indicated Plaintiff was going to see her primary care provider about the left shoulder pain. (R. 908.) Ms. Bennett noted in December that shoulder pain was improving and Plaintiff's pain medications continued to be effective. (R. 903-04.) No specific problems were recorded on physical exam in January 2016. (R. 987.) Plaintiff again reported shoulder pain in February but no abnormal physical findings were reported on objective examination. (R. 891-92.) Ms. Bennett noted that Plaintiff's pain medications enabled her to function and perform activities of daily living with no side effects reported. (R. 892.)

**4.  Other Specialist Treatment**

*a.  Neurology*

Dr. Galicia referred Plaintiff to Wellspan Neurology where she was seen by Ruediger Kratz, M.D., on August 25, 21014.  (R. 574-78.)  Dr. Kratz reported to Dr. Galicia that he believed the back pain was "a combination of degenerative spine disease, although not significant disk disease, and soft tissue disease, as well as sciatica on left."  (R. 574.)  He added that an EMG was in order to distinguish how much was neuropathy and how much radiculopathy. (*Id.*)  As far as management, Dr. Kratz suggested Daypro and Gabapentin but noted he would leave the pain management to Dr. Cho. (*Id.*)  Plaintiff had reported to Dr. Kratz that she had numbness in her legs, left more than right, and sitting for a long time caused more pain, especially in the hips.  (R. 575.)  Plaintiff also described a vibrating sensation when she sat on her left buttock, numbness in her left arm, and attacks of left sided numbness and tingling occurring three to four times a week.  (*Id.*)  Physical exam showed that motor tone and strength were normal in arms and legs with no cramps, contractions, tightness, or atrophy; straight leg raising caused pain in the back of the thighs, not the back; tenderness over the left sciatic notch; sensation to pin, touch, vibration, and temperature in legs up to below the knee on the left and up to the upper calf on the right; position sense was preserved; tendon reflexes absent at ankles and in arms, minimal at

knees; plantar responses were flexor; finger to nose, heel to shin, fine motor and alternating movements were normal; Plaintiff had difficulty with tandem walk and standing on one leg with eyes closed; and Romberg sign was negative.  (R. 577-78.)

Plaintiff had the EMG on September 4, 2014.  (R. 572.)  Xi Lin, M.D., Ph.D., reported the following conclusion: "[t]hese electrophysiological findings are consistent with chronic bilateral S1 radiculopathy and mild sensory motor peripheral neuropathy[;] [r]ight-sided sciatica or lumbosacral plexopathy cannot be ruled out."  (R. 573.)

b.  *Gastronenterolgoy*

Plaintiff saw gastroenterologist John Enders, M.D., on March 20, 2014, following a hospital consultation.  (R. 539.)  By history, he reported that Plaintiff had diabetes mellitus, gastroparesis, and chronic constipation.  (*Id.*)  He noted that she was doing significantly better with Reglan.  (*Id.*)  On physical exam, Dr. Enders found no tenderness in any quadrant, good dorsalis pedis and posterior tibial pulses in extremities; no edema; and movement of all extremities with intact sensation.  (*Id.*)  Dr. Enders' assessment included diabetic gastroparesis and chronic constipation related to narcotics.  (*Id.*) He recommended that Plaintiff continue Reglan but adjust the dosage and return in six months.  (*Id.*)

On March 2, 2015, Plaintiff reported to Dr. Enders that she

18

was doing a little better although she had some flares of the gastroparesis and occasional problems with constipation. (R. 714.) Dr. Enders assessed likely gastroparesis aggravated by narcotic use and poor diabetic control as well was narcotic constipation. (*Id.*)

Acute abdominal series diagnostic imaging done on July 21, 2015, due to abdominal pain showed no acute abnormalities. (R. 726.)

On July 29, 2015, Plaintiff returned reporting she had three episodes of brief nausea with vomiting lasting about two days. (R. 710.) No problems were recorded on physical exam. (Id.) Dr. Enders noted Plaintiff's symptoms did not sound typical for gastroparesis and there was a possibility of atypical bilary tract disease despite a normal CT and ultrasound. (*Id.*) He also raised the possibility of acalculous cholecystitis or gastritis. (*Id.*) Dr. Enders planned to do additional testing and potentially increase the Reglan dosage. (*Id.*)

Diagnostic imaging done on August 6, 2015, showed normal hepatobilliary scan with normal contraction of the gallbladder in response to CCK. (R. 725.) The gallbladder ejection fraction of 41% was not indicative of chronic cholecystitis or biliary dyskinesia. (*Id.*)

c.  *Wound Clinic*

Plaintiff had twelve visits to the wound clinic for treatment of MRSA abesses between February 29, 2012, and September 30, 2012,

19

and she had thirty additional visits since that time.  (Doc. 13 at 7 (citing R. 281, 296-302, 319-43, 346-55, 359-76, 384-96, 412-44, 677-86).)

In January 2014, Plaintiff had a consult with Ganga B. Ramidi, M.D., of Keystone Health who noted that Plaintiff was being treated for MRSA, recurrent in nature, and he questioned whether it was related to poor hygienic measures and uncontrolled diabetes or was autoimmune.  (R. 517.)  Plaintiff reported that she had gotten four to six episodes of MRSA per year.  (R. 518.)  Dr. Ramidi indicated that a potential source of infection could be Plaintiff's multiple broken teeth and cavities.  (R. 518.)  He encouraged her to have a dental evaluation but she said she could not afford it because of a lack of insurance.  (*Id.*)  On physical exam, Dr. Ramidi found that Plaintiff had poor hygiene and dentician, midline sternal scar, right axilla with incision looked good with minimal drainage, no sensory loss, and deep tendon reflexes preserved and symmetric. (R. 520.)  He counseled Plaintiff on hygiene measures, encouraged her to wash her hands after each contact, to avoid skin breakdown and seek medical attention as needed, to avoid contact with sick people, to use clean clothes, not to share insulin needles, and to keep clean.  (R. 517.)

## 5. **Mental Health Treatment**[1]

Plaintiff was treated for depression and anxiety at Spectrum

---

[1] Because Plaintiff's claimed errors do not relate to the ALJ's consideration of mental health impairments, the Court will summarize the evidence relied upon by the ALJ (*see* R. 22).

Health and Wellness from February 24, 2015, through February 19, 2016. (R. 979-1023.) On November 13, 2015, Dr. Coronado stated that Plaintiff had immense feelings of depression, she took psychotropic medications, and he later indicated she had psychotherapy. (R. 980, 1008.) 2015 records indicate that Plaintiff had good insight, and depression was well-controlled on medications. (R. 1003, 1013.)

**B. Opinion Evidence**

**1.  State Agency Psychiatric Consultant**

Jonathan Rightmyer, Ph.D., a State agency consultant, completed a Psychiatric Review Technique on May 13, 2014. (R. 60-61.) Dr. Rightmyer first concluded Plaintiff had anxiety disorders which were not severe. (R. 60.) He opined that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. (R. 61.)

**2.  Pain Specialists**

In June 2014, Dr. Cho, Plaintiff's treating pain specialist, noted the following in the "Comment" section of the office visit record: "[a]dvanced diabetic polyneuropathy is a big problem[;] [p]roximal muscle weakness[;] [t]his patient is not able to work any job." (*Id.*)

Dr. Sarsfield completed a Medical Source Statement form on

Septemeber 23, 2014.  (R. 563-67.)  He found the following:
Plaintiff was not permitted to lift; she had no ability to stand or
walk; she could sit for less than two hours in an eight-hour
workday; she would need to periodically alternate between sitting
and standing; she would need to lie down four times during a work
shift; her ability to push and pull was limited in upper and lower
extremities; she could never climb, balance, stoop, kneel, crouch,
crawl, bend, or twist; she could frequently reach, handle, finger,
and feel; she had environmental limitations in all categories;
impairments were permanent; she would miss work more than three
times a month because of her impairments or treatment; she was
capable of no work; and the onset date of the restriction levels
identified was more than five years earlier.  (*Id.*)  Dr. Sarsfield
attributed limitations to advanced diabetic neuropathy,
degenerative disc disease, and cardiomyopathy.  (R. 563-66.)

### 3.    Primary Care Provider

On July 7, 2014, Plaintiff and Dr. Galicia completed a
Pennsylvania Department of Public Welfare Employability Assessment
Form.  (R. 560-61.)  Following Plaintiff's statement that she could
not work because she was "experiencing pain in lower back, hands,
feet.  Unable to lift things, sit for long periods of time" (R.
560), Dr. Galicia checked a box that Plaintiff was permanently
disabled (R. 561).  Dr. Galicia's handwritten diagnosis appears to
be diabetes type 2, uncontrolled.  (*Id.*)  In check-the-box form,

22

Dr. Galicia indicated this assessment was based on physical examination, review of medical records, clinical history, and appropriate tests and diagnostic procedures. (*Id.*) Dr. Galicia also completed the Health-Sustaining Medication Assessment Form which was to be completed for an "applicant/recipient who requires medication that allows the person to be employable or continue with employment." (R. 562.) While many of Dr. Galicia's entries on the form are not legible, he indicated in part that Plaintiff cannot work without diabetes medications because of uncontrolled blood sugars. (*Id.*)

## C. Testimony

When asked at the March 8, 2016, hearing about the jobs she worked for short periods after her alleged disability onset date, Plaintiff testified that they involved a lot of standing and lifting and she would have to sit down a lot (because of pain in her lower back and neuropathy) which was not acceptable. (R. 38.) Upon questioning by her attorney, Plaintiff reported she had constant pain in her lower back that sometimes traveled down her legs. (R. 41.) She said it was hard for her to lift her eight-pound dog, she could sit for approximately two hours a day but then had to get up because her legs and hips ached, she had to change positions six to seven times a day, she did not walk much, and she estimated she had three to four productive hours a day. (R. 42-43.)

Plaintiff testified that she had gone to the wound clinic approximately once a week from 2011 to 2014 because of MRSA infections and she would be there for thirty to forty-five minutes each time. (R. 43-44.)

Regarding diabetes symptoms, Plaintiff said she had neuropathy of her hands and feet as well as some vision problems. (R. 44.) She explained that the numbness and tingling occurred daily and the condition of her feet affected her ability to walk and stand. (R. 45.)

Plaintiff said she had been hospitalized multiple times since 2014 because of gastroparesis and she would not have been able to work when she had a flare. (R. 46.) When asked about frequency by the ALJ, Plaintiff responded that she had a flare once or twice a month and she had not had one since December or January. (R. 50.) She also said her anxiety and depression were much better since she started medication but she still did not like to be around large crowds. (*Id.*) Identified medication side effects included dental problems and fatigue. (R. 47.) Plaintiff said she was not having any problems at the time related to her cardiac condition. (R. 49.)

When asked about taking care of her mother, Plaintiff said she and her sister did the cooking and cleaning because her mother was unable to do those things. (R. 51.) Plaintiff also said she did her own laundry and she drove her mother to appointments at least

24

twice a week.  (*Id.*)

In response to hypothetical questions posed by the ALJ, the Vocational Expert ("VE") testified that Plaintiff could not perform her past relevant work but other jobs existed in significant numbers in the national economy which Plaintiff could perform.  (R. 53-54.)

## D.  *ALJ Decision*

In her April 15, 2016, Decision, ALJ Torres concluded that Plaintiff had the following severe impairments: diabetes mellitus; peripheral neuropathy; degenerative disc disease of the lumbar spine; coronary artery disease status post myocardial infarction with coronary artery bypass grafting; hypertension; gastroparesis; obstructive sleep apnea; history of MRSA; depression; and anxiety. (R, 14.)  She determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (R. 15.)  ALJ Torres assessed Plaintiff to have the residual functional capacity ("RFC") to perform sedentary work

> except she is limited to occasional climbing
> of ramps and stairs.  The claimant should
> never climb ladders, ropes, or scaffolds.
> She is limited to occasional stooping,
> kneeling, crouching, and crawling.  The
> claimant is limited to occasional pushing or
> pulling with her lower extremities. She
> should avoid concentrated exposure to
> vibrations, fumes, odors, dust, gases, poor
> ventilation, and hazards such as heights and
> moving machinery.  The claimant can
> understand, remember, and carry out simple

instructions.  Moreover, she is limited to
                    occasional interaction with the public.

(R. 17-18.)

        Based on vocational expert testimony, ALJ Torres concluded

that Plaintiff could not perform past relevant work as a hair

stylist, claims clerk, or deli worker but she could perform jobs

that existed in significant numbers in the national economy.  (R.

24-25.)  ALJ Torres therefore concluded that Plaintiff had not been

under a disability from September 30, 2012, through the date of the

decision.  (R. 25.)

                    **II. Disability Determination Process**

        The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[2]  It is necessary for the

--------

        [2]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

                    only if his physical or mental impairment or
                    impairments are of such severity that he is not
                    only unable to do his previous work but cannot,
                    considering his age, education, and work
                    experience, engage in any other kind of
                    substantial gainful work which exists in the
                    national economy, regardless of whether such
                    work exists in the immediate area in which he
                    lives, or whether a specific job vacancy exists
                    for him, or whether he would be hired if he
                    applied for work.

42 U.S.C. § 423(d)(2)(A).

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step

five of the sequential evaluation process when the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform.  (R. 25.)

### III.  Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence— particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for

> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the

court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ erred in failing to adequately consider the number of work absences that would result from emergency room visits and hospital admissions during the relevant time period; 2) the ALJ erred in according limited weight to Plaintiff's treating physicians' opinions; and 3) the ALJ erred in failing to include bilateral radiculopathy as a severe impairment at step two of the sequential evaluation process.  (Doc. 13 at 19.)

## A.    Step Two

Plaintiff contends that the ALJ erred in failing to include bilateral radiculopathy at step two of the sequential evaluation and the error is harmful because the radiculopathy causes Plaintiff to need to change positions frequently between sitting, standing, and lying down throughout the day but the ALJ did not account for the need to change positions in her RFC assessment.  (Doc. 13 at 31; Doc. 15 at 7 (citing R. 40-43).)  Defendant asserts that the claimed error is without merit because Plaintiff's doctors disagreed on exactly what caused her back and leg symptoms and the RFC took into account all credible limitations resulting from her back impairment regardless of the labeled diagnosis.  (Doc. 14 at 21.)  The Court concludes Plaintiff has shown the ALJ's error is cause for remand.

Assuming *arguendo* the ALJ erred by not listing radiculopathy as a severe impairment, Plaintiff has the burden of showing that the error was harmful.  *Shineski v. Sanders*, 556 U.S. 396, 409 (1969); *Woodson v. Comm'r of Social Security*, 661 F. App'x 762, 766 (3d Cir. 2016) (citing *Shineski*, 556 U.S. at 409) (a plaintiff must point to specific evidence that demonstrates his claimed error caused harm); *Holloman v. Comm'r of Social Security*, 639 F. App'x 810, 814 (3d Cir. 2016) (citing *Shineski*, 556 U.S. At 409) (a plaintiff must show how the claimed error made a difference beyond a mere assertion that it did so).  A step two error may be deemed

harmless if the sequential evaluation process continues beyond step two and the functional limitations associated with the impairment are accounted for in the RFC. *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)). In other words, because the outcome of a case depends on the demonstration of functional limitations rather than a diagnosis, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error. *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006) (not precedential) ("Mere presence of a disease or impairment is not enough[;] a claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in any substantial gainful activity."); *Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

In response to Defendant's argument that ALJ Torres included all credible limitations in her RFC assessment and she did not fail to account for limitations related to radiculopathy, Plaintiff relates additional restrictions to the impairment. (Doc. 15 at 7.)

Specifically, Plaintiff points to the September 2014 EMG study which confirmed chronic bilateral radiculopathy as supportive of her testimony about her need to frequently change positions. (*Id.* (citing R. 40-43, 572-73).) Plaintiff asserts "[t]he ALJ did not adequately account for the need to change positions in her RFC assessment for a range of sedentary work, which requires prolonged sitting. As a result, the ALJ's failure to include radiculopathy as a medically determinable impairment was not remedied by the RFC assessment." (*Id.*)

Medical professionals recognize the relationship between lumbar/S1 radiculopathy and difficulty sitting for prolonged periods.[3] This connection is relevant to the assessment of a claimant's ability to do sedentary jobs which are jobs performed primarily in a seated position with no definitional consideration of a need to change positions frequently. 20 C.F.R. §§ 404.1567; SSR 83-10, 1983 WL 31251, at *5. However, the need to alternate between sitting and standing is considered in SSR 96-9P, 1996 WL 374185, at *7, the ruling which generally addresses situations where the claimant has a residual functional capacity for less than the full range of sedentary work. SSR 96-9P indicates that the occupational base will be eroded where the need to change positions cannot be accommodated by scheduled breaks and a lunch period. *Id.*

---

[3] *See* http://www.oamichigan.com/spine/spine-conditions/lumbar-radiculopathy-and-sciatica.

The extent of the erosion depends on the facts in the case record and the RFC must be specific as to the frequency of the individual's need to change positions. *Id.*

In the circumstances presented here, the Court cannot conclude that the step two error was harmless. As Plaintiff alleges, the September 2014 EMG verified chronic bilateral S1 radiculopathy. (R. 572-73.) On several occasions, Plaintiff told treating providers about her difficulty sitting for long periods. (R. 560, 575, 586). Plaintiff testified that she could "sit maybe two hours a day if that. But I have to get up because I start to ache and my legs, my hips start to hurt." (R. 42.) She estimated that she changed positions six to seven times a day depending on what she was doing. (*Id.*) ALJ Torres mentioned the EMG study and referenced Plaintiff's testimony about her "alleged back condition," noting that Plaintiff testified she had constant back pain, she had days she could not get out of bed, she spent five to eight hours a day lying down, she took medication, and she used heating pads. (R. 19-20.) ALJ Torres did not acknowledge Plaintiff's testimony about her need to change positions frequently (R. 42) nor did she acknowledge the multiple times Plaintiff reported to providers that she had difficulty sitting for long periods (R. 560, 575, 586).

As explained in *Rutherford*, 399 F.3d at 553-55, an ALJ must consider all credibly established limitations. A limitation is

credibly established if it is medically supported and not otherwise controverted in the record, *id.* at 554. *Rutherford* added that "[l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible--the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." *Id.* (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993); 20 C.F.R. § 416.929(c)(4)).

The record shows that Plaintiff's limitation regarding continuous sitting was medically supported by the diagnostic September 2014 EMG. As a medically supported limitation, ALJ Torres was required to credit the limitation or discuss why she rejected it if she found the need to change positions contradicted by other evidence. *Rutherford*, 399 F.3d at 554. In this context, the Court cannot conclude that all credibly established limitations were included in the RFC, and, because the limitation not included arguably related to radiculopathy, Plaintiff's claimed step two error cannot be deemed harmless.

**B.    *Medical Treatment Work Absences***

Plaintiff asserts the ALJ erred in failing to adequately consider the number of work absences that would result from emergency room visits and hospital admissions during the relevant time period. (Doc. 13 at 22.) Defendant responds that "the facts overwhelmingly support that Laucella's combined treatments did not

require excessive absences." (Doc. 14 at 17.) Because remand is required on the basis discussed above, the Court concludes further discussion of this issue is warranted.

Defendant states that at the hearing and in the written decision the ALJ reasonably rejected Plaintiff's argument that she could potentially be under a disability due to excessive absences caused by treatments for her impairments. (Doc. 14 at 17 (citing R. 54-56).) The Court does not find explicit consideration of the issue by the ALJ in the record although Defendant's citation to the record shows that Plaintiff's attorney specifically raised the frequency of impairment-related absences at the hearing (R. 55-56).

In that the statutory definition of "disability" includes the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), and the need for treatment related to a medically determinable impairment that would cause absences in excess of the work attendance acceptability rate of one day per month on a regular and consistent basis would indicate an inability to maintain employment (*see* R. 55), Plaintiff's argument has potential merit. The record related to emergency room visits, hospital admissions, and wound clinic visits, as summarized in Plaintiff's brief (Doc. 13 at 23-25), arguably indicates absences that would average more than one day

per month on a consistent basis for some twelve-month period from the alleged onset date to the date of the decision. This deserves more discusion on remand, especially when combined with Plaintiff's testimony that she had a gastroparesis flare once or twice a month (R. 50).[4]

## C. *Treating Physician Opinions*

Plaintiff claims the ALJ erred in according limited weight to the opinions of Drs. Sarsfield, Cho, and Galicia who were all treating physicians. (Doc. 13 at 27.) Defendant responds that the ALJ did not err on the basis alleged. (Doc. 14 at 23.) The Court concludes Plaintiff has not satisfied her burden of showing that the claimed error is cause for reversal or remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[5] *See*, *e.g.*,

---

[4] With this conclusion, the Court notes Plaintiff's testimony that wound clinic visits were weekly during the periods of MRSA infection and the visits would last thirty to forty-five minutes (R. 44) does not indicate, without more, that a would clinic visit would cause her to miss a day of work.

[5] A new regulation regarding weight attributed to a treating source affects cases filed after March 27, 2017. For claims filed after March 27, 2017, 20 C.F.R. § 404.1520c eliminates the treating source rule. In doing so, the Agency recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision." 82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017). This case, filed on October 5, 2016 (Doc. 1), is not affected by the new regulation and is to be analyzed under the regulatory scheme cited

*Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[6] "A cardinal principle

in the text.

[6] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it

38

guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight, especially when

their opinions reflect expert judgment based on continuing

observation of the patient's condition over a prolonged period of

time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

(citations omitted); *see also Brownawell v. Commissioner of Social

Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject

the treating physician's assessment, an ALJ may not make

"speculative inferences from medical reports and may reject a

treating physician's opinion outright only on the basis of

contradictory medical evidence and not due to his or her own

credibility judgments, speculation or lay opinion." *Morales*, 225

F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.

1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

In this section of her brief, Plaintiff generally criticizes

the ALJ for crafting an RFC which was not supported by a medical

source of record. (Doc. 13 at 28.) The Court rejects the

proposition that RFC findings must be based on a medical opinion of

---

controlling weight. When we do not give the
treating source's opinion controlling weight,
we apply the factors listed in paragraphs
(c)(2)(i) and (c)(2)(ii) of this section, as
well as the factors in paragraphs (c)(3)
through (c)(6) of this section in determining
the weight to give the opinion. We will always
give good reasons in our notice of
determination or decision for the weight we
give your treating source's opinion.

record.  Rather, as stated in *Titterington v. Barhart*, 174 F. App'x 6 (3d Cir. 2006), "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC.  Surveying the medical evidence to craft an RFC is part of the ALJ's duties."  *Id.* at 11.  Thus, if a reasonable factfinder, considering the evidence in the record, could have agreed with the ALJ's assessment, a plaintiff has not shown error.  *Id.*

Plaintiff argues that Dr. Sarsfield's opinion should have been accorded great weight for several reasons including that the opinion is consistent with the medical records.  (Doc. 13 at 30.) In support of this assertion, Plaintiff points to record confirmation of chronic diabetic neuropathy, gastroparesis, chronic bilateral radiculopathy, and lumbar degenerative disc disease. (*Id.*)  Importantly, evidence of a diagnosis is not evidence of a functional limitation and the essential inquiry concerns a claimant's ability to function in the workplace.  *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983) ("disability" under the Act determined in terms of the effect a physical or mental impairment has on ability to function in the work place); *see also Walker*, 172 F. App'x at 426 ("Mere presence of a disease or impairment is not enough[;] a claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in any substantial gainful activity.*")  Plaintiff points to no

40

evidence supporting the functional limitations identified by Dr. Sarsfield, and the Court does not find evidence supporting his findings that Plaintiff was unable to lift, was able to stand/walk at most less than two-hours a day,[7] could sit for a total of less than two hours in an eight-hour day, and could never engage in identified postural positions. (R. 563-65.) Therefore, Plaintiff has not shown and the Court cannot conclude that Dr. Sarsfield's opinion is consistent with the medical records. Further, Plaintiff has not shown error in that she has not undermined the evidence of record cited by ALJ Torres in support of her conclusion that the opinion was entitled to limited weight. (*See* R. 23.)

Plaintiff does not provide a specific criticism of the ALJ's analysis of Dr. Cho's opinion and a mere assertion of error is not sufficient to satisfy her burden. Furthermore, Dr. Cho's opinion was expressed in conclusory terms in the "Comment" section of the office notes where he stated "[a]dvanced diabetic polyneuropathy is a big problem[;] [p]roximal muscle weakness[;] [t]his patient is not able to work any job." (R. 582.) ALJ Torres explained several reasons the opinion was not consistent with the record as a whole and cited specific findings contained in the record. (R. 24 (citations omitted).) On this record, the Court cannot conclude the ALJ's determination regarding Dr. Cho's opinion is error.

---

[7] The form either indicates Plaintiff had no ability to stand and/or walk, or she could stand/walk for less than two hours in an eight-hour day. (*See* R. 55, 563.)

The ALJ's criticism of ALJ Torres' analysis of Dr. Galicia's opinion is deficient for the same reason—Plaintiff makes no attempt to undermine contradictory evidence cited by the ALJ and does not otherwise demonstrate error.

Because Plaintiff has not satisfied her burden of showing the ALJ erred in her assessment of treating providers' medical opinions, the claimed error is not cause for reversal or remand.

## V. Conclusion

For the reasons discussed above, Plaintiff'a appeal is granted in part.  This matter is remanded to the Acting Commissioner for further consideration consistent with this Memorandum.  An appropriate Order if filed simultaneously with the Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge

DATED: July 17, 2018